**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 22 2002**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

MERRILEE PETERSEN,

        Plaintiff-Appellant,

and

JAMES WARREN "FLAMING
EAGLE" MOONEY,

        Plaintiff,

    v.

UTAH DEPARTMENT OF
CORRECTIONS, TERRY
BARTLETT, FRED VANDERVEUR,
ROBERT TANSY, O. LANE
McCOTTER, and H. L. PETER
HAUN, individually and in their
official capacities as allowed by law,

        Defendants-Appellees.

No. 01-4090

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 98-CV-320-S)

Kathryn Collard of the Law Firm of Kathryn Collard, LC, Salt Lake City, Utah, for Plaintiff-Appellant.

Brent A. Burnett, Assistant Attorney General (Mark L. Shurtleff, Utah Attorney General, Litigation Division, with him on the brief), Salt Lake City, Utah, for Defendants-Appellees.

Before **KELLY** , Circuit Judge, **BRORBY** , Senior Circuit Judge, and **HARTZ** , Circuit Judge.

**HARTZ** , Circuit Judge.

Plaintiff Merrilee Petersen appeals the district court's grant of summary judgment on her claim against the Utah Department of Corrections (UDOC) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and on her claims against the individual Defendants under 42 U.S.C. § 1983. All her claims derive from the contention that the Defendants retaliated against her for opposing discriminatory treatment of a Native American co-worker. We have jurisdiction under 28 U.S.C. § 1291. Agreeing with the district court that Petersen offered insufficient evidence of such retaliation, we affirm the judgment below.

I.    Background

On appeal of the grant of a motion for summary judgment, we affirm unless the appellant points to evidence in the record establishing a genuine issue of material fact. Fed. R. Civ. P. 56(c). We review the evidence, however, in the light most favorable to the appellant. *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).

Petersen was an employee of the UDOC at the Central Utah Correctional

Facility (CUCF) from September 1990 until November 23, 1998. During that time she advanced in rank, eventually becoming a lieutenant in 1995. In February 1996 she became the Program Coordinator at the CUCF, the position she held during all the events material to this appeal. As Program Coordinator, Petersen was responsible for organizing prison events. She supervised many CUCF employees, including James Mooney, a Native American who served as the Native American Career Rehabilitative Specialist.

Petersen's immediate supervisor was Captain Craig Burr, who reported to Greg Jacquart. This trio worked on the staff of Defendant Robert Tansy, Deputy Warden over the Housing and Programming Department. The Warden was Defendant Fred VanDerVeur; the UDOC Director was Defendant Terry Bartlett.

The chief malefactor in Petersen's account is Tansy. According to her, Tansy employed an abrasive and authoritarian management style and inspired fear in his subordinates. His communications with other employees frequently involved profanity and, more significantly for our case, racial epithets. He used the term "lazy Indian," and, when speaking of Mooney, asked whether the natives were restless and then let out "war whoops" when Petersen did not respond.

Petersen alleges that her opposition to racial and religious discrimination against Mooney led to retaliation by the Defendants. The precipitating event, according to Petersen, was a meeting in Tansy's office on March 3, 1997. Tansy

told Burr and Petersen that Mooney, a probationary employee, was due for a midterm evaluation. Petersen questioned the necessity of the evaluation, as she was unaware of Mooney's probationary status. But Tansy insisted that Mooney was on probationary status and, unlike career employees who received only an annual review, Mooney needed the midterm evaluation. Tansy instructed Burr and Petersen to review Mooney's personnel file and consider it when filling out the evaluation papers.

Once she and Burr left Tansy's presence, Petersen again began to question the propriety of the evaluation. She no longer voiced concerns about the timing of the evaluation, but instead took issue with being told to review the personnel file. She told Burr that she thought employee evaluations were supposed to be based on the supervisor's individual recollection and impressions of the employee's work performance, and not on what was in a file. Accordingly, Petersen never looked at the contents of the file. She did, however, sit down with Burr that afternoon for nearly an hour and a half to discuss Mooney's evaluation while Burr read aloud discipline reports from the personnel file. When Burr called on Petersen the next day to help him finish Mooney's evaluation, she refused, telling him only that she could not take part in something so "wrong . . . treacherous . . . [and] deceitful."

Shortly thereafter, Petersen ran into Lynn VanDerVeur, the wife of Warden

VanDerVeur. Seeing that Petersen was upset, Ms. VanDerVeur asked what was wrong. Petersen "just broke down" and told her that she thought Tansy was engineering a failing report for Mooney. Petersen mentioned nothing about racial or religious discrimination.

Petersen later learned that Ms. VanDerVeur had spoken of Petersen's concerns with her husband, who had then talked with Tansy. On March 7, 1997, believing that VanDerVeur's talk with Tansy might make Tansy upset with her, Petersen went to Tansy's office to smooth things over. But when she explained that she thought it improper for a non-immediate supervisor to direct the outcome of an employee evaluation, Tansy launched into a tirade, calling Petersen a liar and telling her that her "days are numbered." He also threatened to take her "out of the information loop" with respect to all aspects of her job. During the meeting Petersen never expressed concern that Tansy might be discriminating against Mooney based on his race or religion.

Petersen testified that almost immediately after her meeting with Tansy, her superiors took her "out of the information loop"; she further testified that Burr and Jacquart later informed her that Tansy had told them to do just that. Yet she provided only one example of being denied information: she testified that she was not told of a May 30, 1997, banquet until the day before the event.

On May 30, 1997, Petersen made her first accusations of religious and

racial discrimination by Tansy. Mooney had been terminated on April 7 and had filed for unemployment benefits. In connection with the unemployment compensation claim, a UDOC attorney called Petersen, seeking her testimony regarding the circumstances of Mooney's dismissal. Petersen refused to provide any information, stating that, "If I tell you why [Mooney] was fired, I will surely lose my job because I know why he was fired and I don't want to go there." When the conversation ended, Petersen called Warden VanDerVeur. She told him that she "can't go there" and expressed a concern that if she testified, she would get in even more "hot water." She also said, "And now you want me to go up against another state entity and tell them that the reason this man is fired is because my deputy warden didn't like him and he didn't like to have to deal with Native Americans so that he had him fired and he didn't bring his boat back." (The mention of the boat was a reference to an episode in which Mooney had offered to pick up Tansy's boat for him in Texas but did not follow through.) VanDerVeur told her that she should settle down and that an assistant to UDOC Director Bartlett would be contacting her to make arrangements for her testimony in a telephone hearing the following Monday.

For the remainder of the work day Petersen evaded Bartlett's assistant. After work she attended the CUCF's volunteer banquet. At the event Bartlett found Petersen and asked why she was refusing to talk to the UDOC attorney.

She told him that she worried about the security of her job if Tansy were to discover that she spoke out against him. She also told Bartlett that she thought Tansy might be upset if he found out about their conversation. She mentioned her observations of racist behavior by Tansy and said Tansy made fun of Native Americans and was "discriminatory" towards Mooney. In response, Bartlett assured her that he would not allow any retaliation and told her to contact him directly if she ever experienced retaliation.

Within the next few days Petersen had a follow-up telephone conversation with Warden VanDerVeur. Petersen again described Tansy's behavior in performing "war whoops," stating that "all Indians are lazy," and asking "are the natives restless tonight?" Petersen also said that she felt Tansy had been "deceitful doing his stuff behind [Mooney's] back, not being open, how he had told – how I was supposed to create or finish, finalize this evaluation with information I had no knowledge of." VanDerVeur agreed that Mooney had been "railroaded."

On June 26, 1997, Petersen was informed that she was going to receive a lateral transfer. She complained to Bartlett's office, expressing her opinion that the transfer was retaliation by Tansy. Bartlett was not in the office, but his assistant noted that Tansy had not obtained the proper signatures to authorize the transfer. Petersen was not transferred.

At the end of June 1997 an assistant to Bartlett requested Petersen to submit a written memorandum specifying all her complaints regarding Tansy's behavior. Her response was more than six single-spaced pages long. On the fourth page it states: "Tansy spoke of Mooney in a demeaning way. He made digs at the Native American beliefs and ways." Otherwise, it contains no language indicating concern about racial or religious discrimination. The focus of the memorandum is Tansy's alleged power-hungry, obscene, and offensive management style, and Petersen's fear that her act of complaining to one of Tansy's superiors would bring his wrath upon her, threatening her job in the same way it threatened Mooney's.

After receiving the memo, Bartlett ordered an investigation of Petersen's allegations. Although Petersen asserts that the investigation was conducted as an investigation of sexual harassment in order to discredit her, she provides no evidence of any negative consequences to her arising from the investigation. The investigation report was submitted to Bartlett on August 11. It concluded that Tansy, while a strict supervisor, was not in violation of any UDOC harassment policy guidelines or rules. Upon completion of the investigation, Petersen was removed from Tansy's "chain of command," eliminating his supervisory authority over her. During the latter half of 1997 and much of 1998, Tansy missed a substantial amount of work due to illness.

In January 1998 Petersen applied for one of three openings for the rank of captain. Of 23 applicants, Petersen was one of 13 interviewed and tested. Her score for the written exam and interview totaled 88, ranking her seventh among the candidates. When the final selection was made in June, the three with the highest scores—123, 108, and 106—received the promotions. The record contains no evidence describing the UDOC's promotion procedures. When asked about her knowledge of such procedures, Petersen testified, "I don't know."

Meanwhile, Petersen and Mooney had filed this action on May 4, 1998. Then, on November 23, 1998, Petersen resigned her position at the CUCF. She moved to Oregon to join her husband, who already resided there. On September 6, 2000, the district court granted Defendants' motion for summary judgment with respect to Petersen's claims but denied the motion with respect to some of Mooney's claims. Mooney's claims were then settled, while Petersen appealed.

II.     Title VII Claim

Petersen brings her claim against the UDOC under 42 U.S.C. § 2000e-3(a), which states:

> *It shall be an unlawful employment practice for an employer to discriminate against any of his employees* or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any

individual, or for a labor organization to discriminate against any member thereof or applicant for membership, *because he has opposed any practice made an unlawful employment practice by this subchapter* [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

(emphasis added). We have recognized the following three elements for such a retaliation claim: "(1) [the plaintiff] engaged in protected opposition to discrimination; (2) [the plaintiff] suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action." *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001).

The heart of Petersen's claim is Tansy's alleged retaliation after (1) she refused to cooperate on the evaluation of Mooney and (2) Tansy learned that she had complained to Warden VanDerVeur's wife about his treatment of Mooney. What makes this retaliation claim problematic is that on neither occasion did Petersen mention racial or religious discrimination by Tansy. We must therefore consider whether the absence of a reference to unlawful discrimination precludes Petersen's retaliation claim. For the following reasons, we conclude that the absence of such a reference can preclude a retaliation claim because an employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII.

Opposition to an employer's conduct is protected by § 2000e-3(a) only if it is opposition to a "practice made an unlawful employment practice by [Title VII]." Title VII does not prohibit all distasteful practices by employers. Tansy could be unconscionably rude and unfair to Mooney without violating Title VII. In this case Tansy's treatment of Mooney would constitute an unlawful employment practice under Title VII only if Tansy had the requisite intent—that is, only if Tansy mistreated Mooney because of Mooney's race or religion. Accordingly, Petersen's opposition to Tansy's treatment of Mooney would be protected opposition only if her opposition were based on Tansy's unlawful intent. To oppose plain vanilla rude and unfair conduct by Tansy is not to oppose conduct "made an unlawful practice by [Title VII]." (We should note, however, that Petersen's opposition could be protected even if she were wrong about whether Tansy had in fact engaged in a violation of Title VII; it would be enough if she had a "good faith belief that Title VII ha[d] been violated." *Love v. Re/Max of Am., Inc.*, 738 F.2d 383, 385 (10th Cir. 1984).)

It therefore follows that Petersen's superiors could not know that she was engaging in protected opposition unless they knew that her opposition was based (at least in part) on Tansy's bigoted motives. If, for all they knew, Petersen was opposing Tansy's treatment of Mooney simply because the treatment violated established practices and was unfair to Mooney, they would not know that

Petersen was "oppos[ing a] practice made an unlawful employment practice by [Title VII]."

It is crucial, however, whether Petersen's superiors knew that she was engaging in protected opposition. Section 2000e-3(a) bars retaliation by an employer only if it is "because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." An employer's action against an employee cannot be <u>because</u> of that employee's protected opposition unless the employer knows the employee has engaged in protected opposition. *See Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993) ("plaintiff must show that the individual who took adverse action against him knew of the employee's protected activity"); *Gallagher v. Kleinwort Benson Gov't Sec., Inc.*, 698 F. Supp. 1401, 1405-07 (N.D. Ill. 1988) (complaint of unequal pay did not suggest gender discrimination). As a result, retaliation against Petersen would be prohibited by § 2000e-3(a) only if the superior retaliating against her knew that her opposition to Tansy's treatment of Mooney was motivated by a belief that he was engaging in racial or religious discrimination.

We believe that this result is compelled not only by the natural reading of the statutory language, but also by the purpose of the provision. The purpose of § 2000e-3(a) is to let employees feel free to express condemnation of discrimination that violates Title VII. That purpose is hardly served by imposing

sanctions upon employers who take action against employees who never communicate their concern about unlawful discrimination.

We can now readily dispose of Petersen's Title VII retaliation claim. To overcome the UDOC motion for summary judgment, Petersen needed to produce evidence that both (1) the UDOC took adverse employment action against her and (2) the motive for the adverse action was her opposition to Tansy's racial or religious discrimination against Mooney. She failed to meet her burden.

To begin with motive, Petersen testified that on March 7, 1997, Tansy called her a liar, announced that her "days are numbered," and threatened to take her "out of the information loop." At that time, however, Petersen had not communicated to anyone her belief that Tansy had discriminated against Mooney on racial or religious grounds. Tansy was expressing his anger at Petersen for complaining of his treatment of Mooney, but her complaint was not, as far as he knew, protected action under Title VII. Thus, his retaliation would not violate § 2000e-3(a).

To establish a Title VII retaliation claim, Petersen would need to prove that when Tansy allegedly followed through on his threats against Petersen, he not only had this lawful retaliatory motive but was additionally motivated by his learning later that Petersen had complained of his discrimination against Mooney on religious or racial grounds. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281

-13-

(4th Cir. 2000) (plaintiff produced no evidence to show that disparate treatment by supervisor was due to race rather than supervisor's "admittedly low regard" for plaintiff's job performance). But Petersen presented the district court with absolutely no evidence of such an additional motive. Nor is there evidence that any of Petersen's other superiors had an unlawful retaliatory motive. On the contrary, Petersen's testimony indicates that each time she asserted that Tansy had engaged in racial or religious discrimination, her superiors received the charge sympathetically. Petersen's failure to provide evidence of an improper motive for alleged retaliation would in itself require judgment against her.

Petersen fails almost as badly with respect to proof of adverse employment action. "Although the Tenth Circuit liberally defines an 'adverse employment action,' its existence is determined on a case by case basis and does not extend to a mere inconvenience or an alteration of job responsibilities." *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 857 (10th Cir. 2000) (internal quotation marks and citation omitted). The employer's retaliation must be "materially adverse employment action." *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir. 1998). We consider each of Petersen's allegations in turn.

First, she claims that she was taken out of the information loop. Her supporting evidence, however, is short on specifics. At her deposition she pointed to just one occasion on which she was not provided information. She

-14-

testified that she received only one-day's notice of an office banquet—a banquet she actually attended. Perhaps this lack of notice was offensive to Petersen, but it was not a materially adverse employment action.

Next, she complains of the attempt to transfer her to a new position. Yet even if the transfer had been effected, it is uncertain whether it would constitute an adverse employment action. In *Sanchez* we held that a job transfer was not an adverse employment action even though it increased the length of the employee's daily commute from 5-7 minutes to 30-40 minutes. *Id*. at 532. In any event, the attempted job transfer in this case was aborted soon after Petersen learned of it. This unsuccessful attempt to transfer Petersen was not a materially adverse employment action.

Petersen also contends that she suffered unlawful retaliation when her report of complaints about Tansy was treated as a claim of sexual harassment, resulting in ridicule of her by fellow workers. She fails, however, to provide any specifics regarding that ridicule. In *Sanchez* we held that the plaintiff, a teacher, had not suffered a materially adverse employment action when the principal "allegedly made several ageist remarks over the course of the school year, including calling an older substitute teacher 'an old fossil' and welcoming 'bright young teachers' at the first staff meeting." *Id*. at 533. In the absence of evidence of any specific ridiculing remarks, we must draw the same conclusion here.

-15-

Constructive discharge is another component of Petersen's claim of unlawful retaliation. She asserts that Tansy's harassment made staying at the job intolerable. But again the claim fails for lack of evidentiary support. Her allegations of harassment are devoid of specifics. Also, by the time she left her job, Tansy had not been in Petersen's supervisory chain of command for about fifteen months, and he had been out sick for much of that time. She testified that after he was no longer her supervisor: "I was able to work. I was able to do my job. I was able to teach. You know, I didn't get ugly phone calls from him or be brought into the office and, you know, and I didn't have to attend staff meetings. And that was a good thing." No reasonable factfinder could conclude from this record that Tansy's harassment compelled Petersen to leave her job.

Finally, Petersen made one claim of adverse employment action that satisfies the second element of a retaliation claim. She contends that she was denied a promotion because of her protected opposition to the treatment of Mooney. Failure to promote would be a materially adverse employment action. Yet she offers no evidence that the denial of the promotion was caused by her protected opposition. Her last complaint to anyone about Tansy's mistreatment of Mooney was six months before she applied to be a captain and a year before the positions were filled. *See Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (one cannot infer retaliatory motive solely on basis that firing occurred

three months after protected activity). She points to no evidence that the promotion decision was handled in an irregular manner or that anyone in the decisionmaking process even knew of her protected opposition. *See Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1321 (10th Cir. 1999) (no evidence that those making the hiring recommendation were aware of plaintiff's protected conduct). Her evaluation score was seventh among the applicants, and the three persons selected had the highest three scores, all significantly higher than hers. Her claim that she had more relevant experience than other applicants is no more than her own subjective judgment. *See id.* at 1317-18 (employee's own opinions regarding her qualifications do not give rise to a dispute of material fact regarding pretext). Her assertion that Tansy intruded into the selection process is totally speculative.

In short, the record before us is replete with general claims of retaliation but no specifics. The district court had no choice but to grant summary judgment on the Title VII claim.

III.  Section 1983 Claims

A.  *First Amendment Claim*

Petersen contends that she is entitled to relief under § 1983 because the individual Defendants took action against her in retaliation for speech that was protected under the First Amendment (as applied to the states under the

Fourteenth Amendment).  Following *Pickering v. Board of Education*, 391 U.S.

563 (1968), and *Connick v. Myers*, 461 U.S. 138 (1983), we have set forth the

following four-step test for such a claim:

> First, we must determine whether the employee's speech
> can be fairly characterized as constituting speech on a
> matter of public concern.  If it can, we must then
> balance the employee's interest, as a citizen, in
> commenting upon matters of public concern against the
> interest of the State, as an employer, in promoting the
> efficiency of the public service[s] it performs through its
> employees.  These first two questions are legal in nature
> and must be resolved by the court.
>
> If the balance tips in favor of the employee, the
> employee next must prove that the protected speech was
> a substantial factor or a motivating factor in the
> detrimental employment decision.  If the employee
> makes this showing, then the burden shifts to the
> employer to show that it would have made the same
> employment decision in the absence of the protected
> speech.  These final questions concern causation and are
> properly resolved by the factfinder.

*Clinger v. N. M. Highlands Univ., Bd. of Regents*, 215 F.3d 1162, 1165-66  (10th

Cir. 2000) (internal quotation marks and citations omitted).

The speech by Petersen that she contends involved matters of public

concern consisted of her "complaints . . . regarding . . . Tansy's unlawful

discrimination against Mooney on the basis of his race and religion . . . ."  Thus,

to prevail she must establish that these comments by her were "a substantial

factor or a motivating factor" in adverse employment decisions taken against her.

-18-

Our review of the evidence regarding Petersen's Title VII claim against the UDOC can be applied here. We found no evidence of adverse employment action taken against her as a result of her complaints of racial or religious discrimination. Accordingly, Petersen's First Amendment claim must fail. (We also note that the alleged adverse actions—excepting only the failure to promote Petersen to captain—taken together are probably "of insufficient gravity to premise a First Amendment violation." *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1341 (10th Cir. 2000).)

B.     *Equal Protection Claim*

Petersen's § 1983 claim predicated on a denial of equal protection fails for similar reasons. In her brief in chief, Petersen states her equal protection claim as follows:

> Petersen presented evidence from which a reasonable jury could find that her supervisors, the Defendants Tansy, Bartlett and VanDerVeur, "singled her out" of all other similarly situated management level career service employees of the Defendant UDOC, and caused and/or permitted her to be subjected to unlawful retaliation prohibited under state law, because she exercised her right under the First Amendment and the *Utah Protection of Public Employees Act*, to complain to her supervisors about the unlawful race discrimination and retaliation being practiced by the Defendant Tansy, a high level supervisor of the Department, and complained that such unlawful discrimination and retaliation could subject the Defendant UDOC to legal liability.

In short, she alleges that she was treated unequally as a result of her complaints of

-19-

racial discrimination. Even assuming that this states an equal protection claim, *but see Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir. 1996) (refusing to "recognize[] a claim under the equal protection clause for retaliation following complaints of racial discrimination"), we hold that the claim fails for lack of supporting evidence. As previously stated, there is no evidence in the record of any adverse action by the individual Defendants against Petersen motivated by her opposing racial discrimination.

C.  *Due Process Claim*

Finally, Petersen contends that she was denied procedural and substantive due process by the individual Defendants. We are uncertain what procedural rights she claims to have been deprived of, and we fail to see what substantive due process right is implicated in this case. The limited citation to authority in her briefs is of no assistance. Nevertheless, we can quickly dispose of this contention. Petersen claims in her brief that she

> enjoyed substantive and/or procedural due process rights under the *Utah Personnel Management Act, the Utah Anti-Discrimination Act* and the *Utah Protection of Public Employees Act*, not to be subjected to any "adverse action", including his "threats" of adverse actions, because she reported Tansy's suspected violation of State or federal laws prohibiting discrimination and retaliation to her supervisors.

Even if she has stated constitutional rights (which we doubt), our review of the record reveals that she failed to produce evidence that she had suffered adverse

action for reporting any violation of laws prohibiting discrimination.

IV.   Conclusion

We AFFIRM the judgment of the district court.