Doreatha KENNEDY, Plaintiff,

v.

**GENERAL MOTORS CORP.,**
Defendant.

No. 01–2076–JWL.

United States District Court,
D. Kansas.

Aug. 29, 2002.

Ruth M. Benien, Kansas City, KS, for Plaintiff.

David C. Vogel, Rosalee M. McNamara, Lathrop & Gage L.C., Kansas City, MO, for Defendant.

## MEMORANDUM & ORDER

LUNGSTRUM, District Judge.

Plaintiff filed suit against her employer alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. Specifically, plaintiff contends that her su-

pervisors discriminated against her on the basis of her sex, race and/or age and that her supervisors retaliated against her for engaging in protected activity. Plaintiff further contends that her supervisors subjected her to harassment based on her sex, race and/or age and/or in retaliation for engaging in protected activity. This matter is presently before the court on defendant's motion for summary judgment (doc. # 28). As explained more fully below, defendant's motion is granted in part and denied in part.

● Facts

The following facts are uncontroverted or related in the light most favorable to plaintiff, the nonmoving party. Plaintiff is a fifty-year-old African–American female. She began working for defendant in 1973 and, aside from short periods of lay-off, has worked at defendant's assembly plant in Kansas City, Kansas since that time. The first twenty-five years of plaintiff's employment apparently passed without incident and, in any event, are not relevant to the issues in this case. In 1998, however, plaintiff began experiencing allegedly discriminatory and retaliatory conduct that would later form the basis of her complaint in this suit.

In 1998, plaintiff was working as a "pool" member on defendant's "care line." The care line, an area of defendant's reliability department, is the final line at the plant where cars are inspected before defendant ships those cars to dealers. As a "pool" member of the care line, plaintiff essentially "filled in" when regular employees of the care line were absent. Fifteen different jobs existed on the care line and plaintiff was required to know how to perform each of those jobs. In essence, plaintiff was responsible for entering the vehicles on the line, inspecting the specific items relevant to the particular job, and then noting any defects on a form.

During the summer of 1998, defendant's management team decided that employees working on the care line would have to be "certified" at least once per month with respect to the particular jobs to which they were assigned. As a pool member required to perform all of the jobs, plaintiff had to be certified on all fifteen jobs. In this same time frame, plaintiff began working under a new supervisor, Valerie Lussier, and Ms. Lussier began the process of certifying plaintiff and others on the various care line jobs. According to plaintiff, however, Ms. Lussier required plaintiff to go through the certification process more frequently than male pool employees and, in general, monitored plaintiff's work much more closely than the work of plaintiff's male coworkers.

On August 12, 1998, plaintiff was sitting at Station 3 on the care line reviewing the inspection checklist for a particular job when Ms. Lussier approached her. At the time, plaintiff was wearing contact lenses that changed the color of plaintiff's eyes from brown to green. Plaintiff testified that Ms. Lussier leaned over plaintiff, close enough so that plaintiff could feel Ms. Lussier's breath on her face, and asked plaintiff "Are those your eyes or are those contacts?" Ms. Lussier also allegedly told plaintiff, in a "flirty" tone, that her eyes were "pretty." Plaintiff testified that she felt very uncomfortable with this interaction and, as a result, immediately stood up. Ms. Lussier allegedly then changed the subject of the conversation and began discussing motorcycles, having heard that plaintiff rode motorcycles. During this conversation, plaintiff claims that she felt Ms. Lussier's breast touch her right arm. While plaintiff testified to her belief that Ms. Lussier was "coming on to her," she conceded that the incident of physical contact may have been an accident. In any event, plaintiff gave Ms. Lussier a "dirty look" intending to send the message to Ms.

Lussier that plaintiff was not interested in and was uncomfortable with Ms. Lussier's alleged advances.

The next day, a supervisor in "90 conveyor," a different area of the reliability department, asked for an employee from the care line to come to 90 conveyor to perform a particular job. Ms. Lussier advised Wayne Haddock, another pool employee, that he should go to 90 conveyor to perform the job. Plaintiff wanted to go perform the job and, according to plaintiff's evidence, was entitled to go in lieu of Mr. Haddock based on defendant's policy regarding job rotation. The supervisor from 90 conveyor agreed that plaintiff could come and perform the task. As plaintiff was leaving to go to 90 conveyor, however, Ms. Lussier stopped her and said, "Oh, no, no, you're not going to do, you're going to stay right here with me." Ms. Lussier then ordered Mr. Haddock to perform the job in 90 conveyor. According to plaintiff, Ms. Lussier made this decision in an effort to keep plaintiff "close to her."

Later that day, plaintiff sustained an on-the-job injury to her wrist. Plaintiff visited defendant's medical department, had her wrist wrapped, and returned to work the following day, August 14, 1998. On that day, the wrapping on plaintiff's wrist began coming undone and plaintiff's wrist began to swell. Consistent with defendant's procedures, plaintiff requested that her team leader, Billy Bob Butler, obtain for her a "hospital pass" to enable her to visit the medical department. Mr. Butler went to obtain the pass from Ms. Lussier, who refused to give him the pass and requested that plaintiff obtain the pass directly from her. Plaintiff then went to Ms. Lussier, who asked plaintiff to sit down and explain how her injury occurred. Thereafter, Ms. Lussier issued plaintiff the hospital pass. According to plaintiff, plaintiff should not have been required to

obtain the pass from Ms. Lussier and Ms. Lussier imposed such a requirement based on plaintiff's sex or because Ms. Lussier wanted to be "alone" with plaintiff.

After meeting with Ms. Lussier about her wrist injury and the hospital pass, plaintiff filed a grievance through her union representative alleging that Ms. Lussier had sexually harassed plaintiff. The grievance was based on Ms. Lussier's comments about plaintiff's eyes; Ms. Lussier's breast touching plaintiff's arm; Ms. Lussier's statement that plaintiff "was going to stay right here with me;" and Ms. Lussier's meeting with plaintiff about the hospital pass. Defendant provided a copy of the grievance to Ms. Lussier and apparently advised Ms. Lussier that plaintiff did not want to be alone with Ms. Lussier. The next day, Ms. Lussier suspended plaintiff for three days based on plaintiff's failure to perform an assigned job. Specifically, plaintiff had been preparing to inspect a vehicle on the care line when Ms. Lussier started to enter the vehicle from the opposite side. Plaintiff then backed away from the vehicle and told Ms. Lussier that she was not supposed to be alone with Ms. Lussier. Plaintiff refused to get into the car with Ms. Lussier and did not inspect the car.

Plaintiff filed a grievance protesting the suspension and defendant ultimately agreed to remove the discipline from plaintiff's record and pay plaintiff for all lost time. Plaintiff returned to work following her suspension on August 20, 1998. Plaintiff testified that upon plaintiff's return to work, Ms. Lussier began to criticize unfairly plaintiff's work performance and began to "nitpick" plaintiff's performance in an effort to find something wrong with plaintiff's work. Plaintiff further alleges that Ms. Lussier tried to interfere with the investigation of plaintiff's grievance regarding Ms. Lussier's harassment of her.

Just one week after plaintiff returned to work following her suspension, Ms. Lussier again suspended plaintiff, this time for "careless workmanship." The suspension lasted for one week, although plaintiff grieved the suspension and defendant again agreed to clear it from plaintiff's record and pay plaintiff for all lost time.

Plaintiff testified that when she returned from her second suspension, Ms. Lussier continued to treat plaintiff poorly. Specifically, plaintiff testified that Ms. Lussier continued to scrutinize plaintiff's work performance while failing to monitor the performance of other employees in such a manner and that Ms. Lussier repeatedly assigned plaintiff the least desirable and most physically demanding tasks on the care line. Plaintiff further testified that Ms. Lussier wrongfully accused plaintiff of missing work for invalid reasons and, in general, verbally abused plaintiff. According to plaintiff, Ms. Lussier's treatment of her continued until late October 1998, when Ms. Lussier was transferred to another department and, thus, no longer had direct supervisory authority over or daily contact with plaintiff.

In late October 1998, plaintiff began working under the supervision of James Miraglia and Sieg Siegele. According to plaintiff, she had been labelled a "troublemaker" based on the grievance she had filed with respect to Ms. Lussier and, as a result, Mssrs. Miraglia and Siegele were "out to get plaintiff" and continued Ms. Lussier's campaign to mistreat plaintiff. Plaintiff testified that over the next eighteen months of her employment (i.e., until plaintiff went on sick leave on May 5, 2000) Mssrs. Miraglia and Siegele constantly "picked on her;" refused to let plaintiff rotate to other jobs; assigned plaintiff to the least desirable and most demanding jobs; and excessively monitored and criticized plaintiff's work performance. Plaintiff further testified that her supervisors wrongfully denied her bereavement leave on one occasion; wrongfully denied her vacation time on one occasion; wrongfully accused her of tardiness on several occasions; allowed one of plaintiff's coworkers to verbally threaten plaintiff on one occasion; wrongfully issued plaintiff a written warning for an unexcused absence; and ignored plaintiff's medical restrictions.

On May 5, 2000, plaintiff went on sick leave due to a heart problem. She returned to regular employment from her medical leave in January 2002.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir.2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories, Inc.*, 259 F.3d 1226, 1231–32 (10th Cir.2001) (citing *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In attempt-

ing to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. American Guarantee & Liability Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler*, 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; accord *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir.2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore, Oklahoma*, 218 F.3d 1190, 1197–98 (10th Cir.2000) (quoting *Adler*, 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibits incorporated therein." *Adams*, 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

### III. Discussion

In the pretrial order, plaintiff contends that Ms. Lussier, Mr. Miraglia and Mr. Siegele discriminated against her on the basis of her sex, race and/or age and that they retaliated against her for engaging in protected activity. Plaintiff further contends that the alleged discriminatory and/or retaliatory acts, taken together, establish a pattern of retaliatory harassment and/or harassment based on plaintiff's sex, race and/or age.

- Discrete Acts of Alleged Discrimination and/or Retaliation

The court begins with plaintiff's claims that her supervisors discriminated against her on the basis of plaintiff's sex, race and/or age and that they retaliated against plaintiff for engaging in protected activity. In that regard, plaintiff has identified the following allegedly discriminatory and/or retaliatory acts: plaintiff's two suspensions by Ms. Lussier; the frequent and excessive certifying, monitoring and criticizing of plaintiff's work performance by all three supervisors; assignment to the least desirable and most demanding jobs by all three supervisors; Mssrs. Miraglia and Siegele's refusal to permit plaintiff to rotate jobs; Ms. Lussier's attempt to interfere with or stop the investigation of plaintiff's grievance; Ms. Lussier's subjecting plaintiff to disparate treatment regarding the issuance of a hospital pass; Ms. Lussier's accusing plaintiff of missing work for invalid reasons; Mssrs. Miraglia and Siegele's accusing plaintiff of tardiness; Mssrs. Miraglia and Siegele's denying plaintiff vacation time and bereavement leave; Mr. Siegele's issuing plaintiff a written warning for an unexcused absence; Mssrs. Miraglia and Siegele's ignoring plaintiff's medical restrictions; Mssrs. Miraglia and Siegele's allowing one of plaintiff's coworkers to verbally threaten plaintiff; and general but regular verbal abuse by all three supervisors.

● Plaintiff's Suspensions

■ Because defendant, in its motion, has addressed plaintiff's claim concerning her two suspensions separately from plaintiff's claims concerning other discrete acts, the court addresses defendant's arguments regarding plaintiff's suspensions separately. In its motion, defendant characterizes plaintiff's claim concerning her suspensions solely as a retaliation claim. It is unclear to the court, however, whether plaintiff contends that her suspensions were based not only on plaintiff's protected activity but also (or in the alternative) on plaintiff's sex, race and/or age. In any event, to the extent plaintiff contends that her suspensions were based on her race and/or age, such claims would be untimely as plaintiff did not file a charge of discrimination alleging race or age discrimination until more than two years after her suspensions. See *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 2070–71, 153 L.Ed.2d 106 (2002) (with respect to discrete acts such as suspensions, party must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it). To the extent plaintiff contends that her suspensions were based on her sex, such claim is arguably still viable as defendant has not moved for summary judgment on that particular claim.

Defendant challenges plaintiff's retaliation claim concerning her suspensions on three separate and independent grounds. Specifically, defendant contends that plaintiff's filing a grievance concerning Ms. Lussier's alleged sexual harassment does not constitute "protected" activity; that plaintiff's two suspensions do not constitute "adverse employment actions;" and that plaintiff cannot show that defendant's proffered reasons for plaintiff's suspensions are pretextual. The court rejects each of these arguments.

*Protected Activity*

■ According to defendant, plaintiff cannot demonstrate that she engaged in "protected" opposition to discrimination. See *Petersen v. Utah Dep't of Corrections*, 301 F.3d 1182 (10th Cir.2002) (to state a prima facie case of retaliation, plaintiff must show, inter alia, that he engaged in "protected" opposition to discrimination). Specifically, defendant contends that plaintiff's belief that Ms. Lussier's conduct violated Title VII was neither subjectively in good faith nor was it objectively reasonable. Plaintiff's own deposition testimony, however, is sufficient to create a material fact issue regarding whether she subjectively believed that Ms. Lussier's conduct constituted sexual harassment within the meaning of Title VII.

Moreover, as defendant concedes, the Tenth Circuit requires only a subjectively good faith belief-not an objectively reasonable one. See *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 385 (10th Cir.1984) ("opposition activity is protected when it is based on a mistaken good faith belief that Title VII has been violated"). Nonetheless, defendant contends that the Tenth Circuit "appears" to be "leaning in the direction" of requiring that the plaintiff's belief be objectively reasonable as well. The court disagrees with defendant's assessment of the Circuit's intentions in that regard, as just last week the Circuit reiterated its conclusion in Love that a plaintiff's opposition to discrimination is "protected" so long as the plaintiff had a "good faith belief" that Title VII had been violated. See *Petersen*, 301 F.3d at 1188 ("We should note, however, that Petersen's opposition could be protected even if she were wrong about whether Tansy had in fact engaged in a violation of Title VII; it would be enough if she had a 'good faith belief that Title VII ha[d] been violated.' " (quoting *Love*, 738 F.2d at 385)).

Defendant also maintains that the Supreme Court, in *Clark County School District v. Breeden*, 532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001), endorsed the concept that an employee's belief must be objectively reasonable. In *Breeden*, the plaintiff argued that she was retaliated against for complaining to higher management about an incident that had taken place between her and her supervisor. *Id.* at 269–70, 121 S.Ct. 1508. During a meeting, plaintiff's supervisor read aloud a sexually explicit comment from an applicant's psychological evaluation report. *Id.* at 269, 121 S.Ct. 1508. Plaintiff's male supervisor looked at plaintiff, and stated, "I don't know what that means." *Id.* Another employee replied, "Well, I'll tell you later," and both men chuckled. *Id.* Plaintiff complained about the comment to the offending supervisor and other officials of defendant school district. *Id.* at 269–70, 121 S.Ct. 1508. She subsequently filed a Title VII retaliation claim, asserting that she was punished for these complaints. *Id.* at 270, 121 S.Ct. 1508. The district court granted summary judgment to the school district, but the Ninth Circuit reversed, concluding that a genuine issue of material fact existed as to whether plaintiff had engaged in protected activity. *Id.* at 269, 121 S.Ct. 1508. The Supreme Court reversed the Ninth Circuit. *Id.*, 121 S.Ct. 1508 In doing so, the Supreme Court utilized the Ninth Circuit's "reasonable belief" standard and expressly declined the opportunity to "rule on the propriety" of that standard "because even assuming it is correct, no one could reasonably believe that the incident recounted above violated Title VII." *Id.* at 270, 121 S.Ct. 1508.

The *Breeden* decision, then, is somewhat curious in that the Court seems to have held the plaintiff to the more stringent "reasonable belief" test, concluded that the plaintiff's claim failed under that more stringent test, but declined to determine whether that test was the appropriate standard. The court, then, cannot say with any degree of certainty what the import of the *Breeden* decision is, including whether the Supreme Court really meant to imply that as a matter of law the plaintiff could not have actually believed that her supervisor's conduct violated Title VII. The point, however, is largely irrelevant as the Tenth Circuit-in a decision that was issued after the Supreme Court's *Breeden* decision-recently restated its adherence to the subjective standard without mention of the *Breeden* decision. See *Petersen*, 301 F.3d at 1188. To the extent that there is any discrepancy between Breeden and *Petersen*, that is a matter to be clarified by the Circuit and not this court in light of the Circuit's unequivocal statement of the standard in *Petersen*.

In any event, even if this court were to utilize the "objectively reasonable" standard, it would nonetheless conclude that plaintiff is entitled to have a jury determine whether her complaint was objectively reasonable. Unlike the facts of *Breeden*, plaintiff's complaint was not based on a single incident that she should have expected to experience in the ordinary course of her job duties. Cf. *Breeden*, 532 U.S. at 271, 121 S.Ct. 1508 (the ordinary terms and conditions of plaintiff's job required her to review the sexually explicit statement in the course of screening job applicants).

*Suspensions as Adverse Employment Actions*

■ As an alternative to its arguments concerning plaintiff's belief that Ms. Lussier's conduct violated Title VII, defendant contends that it is nonetheless entitled to summary judgment because plaintiff's two suspensions, as a matter of law, do not constitute adverse employment actions. See *Petersen*, 301 F.3d at 1182 (to state a prima facie case of retaliation, plaintiff must show, inter alia, that he suffered an

adverse employment action). According to defendant, plaintiff's suspensions are simply not adverse actions because both suspensions have been cleared from plaintiff's record and defendant has agreed to pay plaintiff for all lost time. In that regard, defendant highlights that the Circuit, albeit in an unpublished decision, has recognized that a "one-week suspension with pay after an admitted refusal to comply with new work processes" does not qualify as an adverse employment action. See *Prickett v. Amoco Oil Co.*, 31 Fed.Appx. 608, 2002 WL 373979, at *2 (10th Cir.2002). However, despite defendant's apparent agreement to pay plaintiff for her lost time, plaintiff has averred that in fact to date she has not been paid for her lost time. Cf. *Russell v. Bd. of Trustees Of Univ. of Ill.*, 243 F.3d 336, 341–42 (7th Cir.2001) (five-day suspension with loss of pay and a finding that plaintiff falsified pay sheet was adverse employment action). Moreover, unlike the plaintiff in *Prickett*, plaintiff here has not "admitted" to engaging in conduct warranting a suspension; she contends that the reasons proffered for her suspensions were pretextual. For these reasons, the *Prickett* decision is distinguishable.

■ Moreover, the Tenth Circuit has recognized that employment actions, including suspensions, can be adverse even if such actions are subsequently withdrawn. See *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir.1998) ("Actions such as suspensions or terminations are by their nature adverse even if subsequently withdrawn.") In other words, the mere fact that an employer retracts an adverse employment action does not absolve the employer from liability if the initial employment decision was based on an unlawful, discriminatory motive. The court, then, rejects this argument.

*Pretext*

■ Finally, defendant asserts that even if plaintiff can demonstrate that she engaged in protected activity and that she suffered adverse action, defendant is still entitled to summary judgment on plaintiff's retaliation claim because defendant had a legitimate business reasons for plaintiff's suspensions and plaintiff cannot establish that these reasons are pretextual. The record, however, contains evidence from which a reasonable jury could conclude that Ms. Lussier did not suspend other employees in plaintiff's pool who had violated similar work rules and that these other employees were given the opportunity to go back and complete their assigned tasks in lieu of facing suspension. See *Watts v. City of Norman*, 270 F.3d 1288, 1293 (10th Cir.2001) ("One of the established methods of proving pretext is to show that the employer treated the plaintiff 'differently from other similarly situated employees who violated work rules of comparable seriousness.' ") (quoting *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1230 (10th Cir.2000); *English v. Colorado Dept. of Corrections*, 248 F.3d 1002, 1011 (10th Cir.2001)).

● Remaining Discrete Acts

In its motion for summary judgment, defendant, in large part, does not address with specificity the remaining discrete acts of alleged discrimination and/or retaliation challenged by plaintiff. Rather, defendant asserts, in rather summary fashion, that none of the acts identified by plaintiff rises to the level of an adverse employment action. While plaintiff suggests in her papers that she is entitled to survive summary judgment because defendant has failed to address specifically each of the acts challenged by her, the court believes that defendant's motion-while far from thorough-sufficiently tees up the relevant

inquiry-whether the acts alleged by plaintiff are "adverse actions" such that plaintiff could recover damages based on those discrete acts independently of her harassment claims that incorporate those same acts.

■ As set forth in more detail below, the court agrees with defendant that none of the acts identified by plaintiff (aside from her suspensions), standing alone, constitute "adverse employment actions" such that plaintiff would be entitled to submit a separate claim to the jury with respect to each individual instance of alleged discrimination and/or retaliation. In other words, plaintiff's evidence does not establish a prima facie case of retaliation on any individual instance other than her suspensions. However, as discussed below in section III.B. of this opinion, plaintiff is entitled to a trial on her claim that all of the individual acts, when considered together, rise to the level of an adverse employment action. See, e.g., *Gunnell v. Utah Valley State College,* 152 F.3d 1253, 1264 (10th Cir. 1998) ("retaliatory harassment, if sufficiently severe, may constitute 'adverse employment action' for purposes of a retaliation claim").

As plaintiff has no direct evidence of discrimination or retaliation, the court analyzes plaintiff's claims under the familiar burden-shifting framework first pronounced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). With respect to each of her claims, plaintiff must demonstrate, inter alia, that she suffered an adverse employment action. See *O'Neal v. Ferguson Constr. Co.,* 237 F.3d 1248, 1252 (10th Cir.2001) (retaliation); *Trujillo v. University of Colo. Health Sciences Ctr.,* 157 F.3d 1211, 1215 (10th Cir.1998) (race discrimination). As described below, plaintiff has not presented evidence that any of the acts about which she complains (aside from her suspensions) rises to the

level of an "adverse employment action" for purposes of Title VII or ADEA liability. For this reason, summary judgment is granted in favor of defendant with respect to plaintiff's remaining claims concerning discrete acts of discrimination and/or retaliation.

The Supreme Court has explained that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Although the Tenth Circuit liberally defines "adverse employment action," the Circuit nonetheless takes a case-by-case approach in determining whether a given action is "adverse" and examines the unique factors relevant to the situation at hand. See *Jeffries v. Kansas,* 147 F.3d 1220, 1231–32 (10th Cir.1998). Bearing this standard in mind, the court concludes that summary judgment in favor of defendant is warranted as no reasonable jury could find that plaintiff suffered any adverse employment action aside from her suspensions.

Plaintiff's primary complaint is that her supervisors certified, monitored and criticized plaintiff's work performance more frequently than that of other employees and that her supervisors refused to permit her to rotate jobs, leaving her to work on the least desirable and most demanding jobs. In support of her assertion that these acts constitute adverse employment actions, plaintiff theorizes that these acts place unnecessary stress on the targeted employee, that such stress causes the employee to be more prone to work-related errors, and that such errors naturally lead to that employee being disciplined and, possibly, discharged for poor performance.

In a related vein, plaintiff contends that a targeted employee is more likely to get disciplined or discharged for mistakes simply because management will find more mistakes by checking the employee's work more frequently. Plaintiff further alleges that an employee who is left doing the same repetitive and difficult job (rather than rotating pursuant to the terms of defendant's contract with the union) is more likely to sustain a work-related injury and, thus, that employee's chances of missing work time are increased. Significantly, plaintiff does not contend that she actually sustained any injuries because she was not permitted to rotated jobs, nor does she contend that she was disciplined in any way for making work-related errors (other than the suspensions described above). Plaintiff's theory, then, is that defendant's conduct is sufficient to constitute adverse action not because of any harm that plaintiff sustained to her employment status but because of the sheer potential that plaintiff, one day, might sustain harm to her employment status.

■ While the Tenth Circuit has recognized that an adverse employment action can arise from events having an adverse impact on future employment opportunities, see *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir.1996), the Circuit has limited the scope of this principle to those cases in which the plaintiff demonstrates a clear, concrete or significant risk to future employment opportunities. See *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986–87 (10th Cir.1996) (wrongfully reporting plaintiff of a suspected crime constituted an adverse employment action because being a defendant in a criminal trial "carries a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects"); *Apgar*

*v. State of Wyoming*, 221 F.3d 1351, 2000 WL 1059444, at *10 (10th Cir.2000) (final report concluding that plaintiff should not be considered for rehire constituted adverse action because it had an adverse impact on future employment opportunities with defendant). By contrast, plaintiff has not shown any real or significant risk of harm to her future employment opportunities based on defendant's conduct. Plaintiff's theory that defendant's refusal to allow her to rotate jobs might increase her chances of sustaining a work-related injury or that defendant's increased monitoring of her work might result in a higher number of errors rests solely on plaintiff's own, untested belief. For this reason, the court concludes that plaintiff's theory of future harm does not fit into the Circuit's (very few) "future employment opportunities" cases. Indeed, as the Circuit has noted,

> It is one thing to hold that a criminal complaint or negative reference letter is an adverse employment action. It is an entirely different matter to hold that any action taken by a plaintiff's employer ... that may affect the plaintiff's future employment opportunities is an adverse employment action.

*Aquilino v. University of Kansas*, 268 F.3d 930, 935 (10th Cir., 2001).

Moreover, the Tenth Circuit has repeatedly cautioned that "[s]peculative harm does not constitute adverse employment action." *Aquilino*, 268 F.3d at 936; *Trimmer v. United States Dep't of Labor*, 174 F.3d 1098, 1103–04 (10th Cir.1999) (in a case arising under a federal whistle blower statute, holding that employee's evidence concerning future employment harm was too speculative to constitute adverse employment action). For this reason, too, the court concludes that defen-

dant's excessive monitoring of plaintiff's work and refusal to permit plaintiff to rotate jobs do not constitute adverse employment actions. Simply put, plaintiff's theory of harm is too speculative.

Plaintiff also highlights a handful of instances in which she was reprimanded by her supervisors. Specifically, she claims that Mssrs. Miraglia and Siegele wrongfully accused her of tardiness and, on one occasion, that Mr. Siegele issued her a written warning for an unexcused absence. Plaintiff, however, in no way suggests that these actions had any effect on her employment status with defendant. See *Sanchez v. Denver Public Schools*, 164 F.3d 527, 533 (10th Cir.1998) (unsubstantiated oral reprimands are not included within the definition of adverse action absent evidence that they had some impact on the employee's employment status); accord *Johnson v. E.A. Miller, Inc.*, 172 F.3d 62, 1999 WL 94827, at *2 (10th Cir.1999) (notwithstanding Circuit's liberal definition of "adverse employment action," meeting with management at which plaintiff was reprimanded does not constitute adverse employment action).[1] In short, the record is devoid of any evidence (and, significantly, plaintiff's papers are devoid of any argument) that any reprimands concerning her tardiness or attendance had any effect whatsoever on her employment. Thus, no reasonable jury could conclude that these reprimands, either oral or written, are sufficient to constitute adverse actions. Cf. *Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098, 1104 (10th Cir.1998) (written warnings constituted adverse actions where evidence demonstrated that the more warnings an employee received, the more likely he or she was to be terminated for a further infraction).

Similarly, no reasonable jury could conclude that Ms. Lussier's apparently unsuccessful attempt to stop the investigation of plaintiff's grievance had any tangible effect on plaintiff's status or that Mssrs. Miraglia and Siegele's refusal to honor plaintiff's medical restrictions significantly impacted plaintiff's status. There is no evidence or argument, for example, that plaintiff was injured on the job and missed work because her supervisors assigned her to tasks inconsistent with her medical restrictions. In fact, plaintiff's papers shed no light whatsoever on her claim with respect to her medical restrictions. Moreover, the record is devoid of any evidence demonstrating that her supervisors' allowing another coworker, on one occasion, to verbally threaten her or management's general verbal abuse and "picking on" plaintiff-standing alone-had any negative impact on plaintiff's employment, aside from the general distress it may have caused her. Under Tenth Circuit precedent, however, the distress plaintiff may have suffered from such acts or omissions is simply not enough for these claims to get to a jury. See *Sanchez v. Denver Public Schools*, 164 F.3d 527, 533 (10th Cir.1998) ("Although we appreciate Ms. Sanchez's distress over [her supervisor's] alleged disagreeable conduct, that conduct did not significantly affect her employment status and therefore did not constitute adverse employment action remediable under Title VII."). In short, absent some evidence that plaintiff's job was negatively impacted by her supervisors' conduct, the court believes that the Circuit would decline to expand the scope of adverse employment action to

---

1. Pursuant to Tenth Circuit Rule 36.3(B)(1), the court cites this unpublished opinion for its persuasive value.

include the types of actions challenged by plaintiff in this case.

Finally, plaintiff challenges acts that, at most, amounted to an inconvenience to plaintiff, including Ms. Lussier's requiring plaintiff to obtain a hospital pass directly from Ms. Lussier rather than through plaintiff's team leader and Mssrs. Miraglia and Siegele's denying plaintiff vacation time and bereavement leave. Again, there is no evidence or suggestion that these acts had any impact on plaintiff's employment status. Moreover, there is no evidence that Mssrs. Miraglia and Siegele denied plaintiff vacation time altogether; plaintiff's contention is only that she did not receive the specific vacation time that she requested. Similarly, plaintiff does not contend that she was denied bereavement leave altogether, but only that such leave did not start as soon as she would have liked. In the absence of any argument from plaintiff suggesting that these acts had a tangible effect on plaintiff's employment, no reasonable jury could conclude that they constitute adverse employment actions. See *Sanchez*, 164 F.3d at 532 ("we will not consider a mere inconvenience … to be an adverse employment action").

In sum, no reasonable jury could conclude, based on the record before the court, that any of the discrete acts identified by plaintiff (aside from her suspensions), standing alone, constitute an "adverse employment action" within the meaning of the federal anti-discrimination laws. Summary judgment is therefore granted in favor of defendant on plaintiff's claims concerning discrete acts of discrimination and/or retaliation other than her suspensions. As described in the next section, however, plaintiff is entitled to a jury trial on the issue of whether these acts, when considered in the aggregate, constitute an "adverse employment action" for purposes of establishing a retaliation claim.

● Harassment Claims

█ The court now turns to analyze plaintiff's harassment claims-an analysis that will be quite limited due to the nature of defendant's briefing with respect to these claims. As an initial matter, defendant treats plaintiff's allegations concerning Ms. Lussier as a separate and distinct claim from her allegations concerning Mssrs. Miraglia and Siegele. Thus, defendant spends a vast majority of its brief arguing that plaintiff cannot set forth a submissible claim of sexual harassment based on the alleged conduct of Valerie Lussier. In other words, defendant has failed to analyze plaintiff's harassment claims as a whole—by looking at the conduct plaintiff allegedly endured not only while she was supervised by Ms. Lussier but also while she was supervised by Mssrs. Miraglia and Siegele.

Moreover, defendant has characterized plaintiff's harassment claim with respect to Ms. Lussier's conduct as being limited to the events occurring over the three-day period from August 12, 1998 through August 14, 1998. Defendant then contends that Ms. Lussier's conduct over those three days was not severe or pervasive enough to constitute sexual harassment within the meaning of Title VII. But plaintiff's evidence demonstrates that her harassment claim is based not only on the events occurring over those three days, but also on Ms. Lussier's general treatment of plaintiff (e.g., certifying plaintiff more often than male employees and repeatedly assigning plaintiff to the least desirable and most physically demanding tasks on the care line). In addition, plaintiff's evidence shows that she continued to suffer the same type of harassment when she began working under Mssrs. Miraglia

**1270**

and Siegele-evidence which defendant summarily dismisses in its papers.

Finally, defendant's papers are silent with respect to plaintiff's theory that she was harassed because she engaged in protected activity. As noted above, the Tenth Circuit has held that retaliatory harassment, if sufficiently severe, may constitute adverse employment action for purposes of a retaliation claim. See supra p. 16–17 (citing *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1264 (10th Cir.1998)). A jury, then, will decide whether plaintiff's supervisors, based on plaintiff's complaints, subjected plaintiff to sufficiently severe or pervasive harassment.

In short, the court finds that defendant's motion is inadequate in its treatment of plaintiff's harassment claims. While defendant may believe (as its papers suggest) that plaintiff's claims are so meritless that they do not warrant discussion, the court cannot agree with that assessment based on the record before it. As defendant has not met its burden to show that no genuine issue of material fact exists regarding plaintiff's harassment claims, its motion on those claims is denied.

IT IS THEREFORE ORDERED BY THE COURT THAT defendant's motion for summary judgment (doc. #28) is granted in part and denied in part.

IT IS SO ORDERED.